(No. 15550.—Judgment affirmed.)

THE NATURAL PRODUCTS COMPANY, Appellant, *vs.* THE
COUNTY OF DuPAGE *et al.* Appellees.

*Opinion filed October 28, 1924.*

1. HIGHWAYS—*sections 18-24 of Roads and Bridges act apply
only to contracts let by State for State aid roads.* Sections 18, 20,
21, 22 and 24 of the Roads and Bridges act apply only to contracts
for State aid roads let by the State under section 26, and where a
contract is let by the county under section 15*d* the provisions of
sections 18-24 need not be complied with, as the procedure in the
latter case is provided for in section 15*d*.

2. SAME—*purpose of section 15d of the Roads and Bridges act.*
Section 15*d* of the Roads and Bridges act, for the construction of
State aid roads, was enacted for the purpose of authorizing any
county to build or let contracts for building such roads, and said
section provides the whole method of procedure for letting such
contracts, without reference to other sections of the act.

3. SAME—*what are not conditions precedent to authorize county
vote for bonds and tax for State aid roads.* In a proceeding by a
county to construct State aid roads under section 15*d* of the Roads
and Bridges act, the plans, specifications and estimates of the State
Highway Commission may be furnished at the time of the let-
ting of the contract for the building of the roads by the county, and
they are not conditions precedent to a vote for bonds and for a
special tax.

4. SAME—*the county is authorized to incur entire obligation for
State aid roads.* Under section 15*d* of the Roads and Bridges act
the county is authorized to take the initiative in letting contracts
for State aid roads, and it is no valid objection to the issue of
bonds and the incurring of the obligation of the county for such
purpose that it is in anticipation of reimbursement by the State
of its share of the expense.

5. STATUTES—*particular provision will prevail over general pro-
vision.* Where there are two provisions in a statute, one of which
is general and designed to apply to cases generally and another is
particular and relates only to one subject, the particular provision
must prevail and must be treated as an exception to the general
provision.

6. ELECTIONS—*general rule as to when notice of time of elec-
tion is sufficient.* Where the great body of the electors have actual
notice of the time and place of the holding of an election and of
the questions submitted, and where no prejudice is shown, the elec-
tion notice is sufficient although not in compliance with the law.

7. SAME—*when election for bonds and tax under section 15d of Roads and Bridges act is not invalid.* A special election on the propositions of issuing bonds and the levying of a special tax for the construction of State aid roads by a county under section 15*d* of the Roads and Bridges act is not, in the absence of a showing of prejudice, vitiated by the fact that the polls were opened and closed as provided in the Australian Ballot law for general elections and not in accordance with the Election law of 1872.

APPEAL from the Circuit Court of DuPage county; the Hons. MAZZINI SLUSSER, C. F. IRWIN and WILLIAM J. FULTON, Judges, presiding.

HARRY S. MECARTNEY, (EDMUND J. REYNOLDS, of counsel,) for appellant.

C. W. REED, State's Attorney, (HORACE S. OAKLEY, and JOSEPH A. REUSS, of counsel,) for appellees.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

Appellant, the Natural Products Company, a resident tax-payer of DuPage county, filed its bill in the circuit court of said county against the county of DuPage, the Northern Trust Company, the treasurer, clerk and all the supervisors of said county, to enjoin the issuing of $1,350,-000 of road bonds and the levying of an additional tax for the payment of the principal and interest on the bonds of the county of DuPage. The cause was heard by three circuit judges sitting together, by agreement of the parties. The court denied the injunction and dismissed the bill for want of equity.

The facts are not in dispute. In November, 1922, the board of supervisors of DuPage county passed a resolution to borrow $1,350,000 on the credit of the county, and to levy an additional tax of forty cents on each $100 assessed valuation of property in the county for twenty years, be-

ginning with the year 1923, to pay said indebtedness, for the purpose of improving and constructing State aid roads in the county. The resolution gave the name and number of each State aid road to be constructed, described the same, stated the length thereof in miles and furnished an estimate of the cost thereof. The total length of the roads to be constructed is a fraction over one hundred miles. The roads to be constructed were all described as having an eighteen-foot pavement upon a thirty-four-foot graded roadway. Two of the roads were to be surfaced with cement concrete pavement and the rest of them with macadam pavement with a bituminous binder. The resolution provided for a special election to be held on Wednesday, November 29, 1922, for the purpose of a vote of the people of the county for or against the bonds and for or against the special tax to pay the bonds and interest. The vote on the bonds and the special tax was to be had under the provisions of section 15*d* of the Roads and Bridges act. On the same day the resolution was adopted by the county board a copy thereof was taken to the Department of Public Works and Buildings at Springfield, and that department returned the resolution with this indorsement thereon:

"Approved, November 1, 1922.
DEPARTMENT OF PUBLIC WORKS AND BUILDINGS,
DIVISION OF HIGHWAYS.
C. R. Miller, *Director.*
Frank T. Sheets, *Sup't of Highways.*"

The copy of the resolution, with said indorsement, was returned and filed in the office of the county clerk of DuPage county. On November 7, 1922, the county clerk issued an election notice calling a special election to vote upon the questions of issuing the bonds and authorizing the additional tax levy. This notice provided that the polls should be open at seven o'clock in the morning and continue open until five o'clock in the afternoon. At the election there were cast 2058 votes for and 1265 against the issuance

of the bonds and the levying of the additional tax. The county then executed by its officers and agents, and was intending to deliver, $600,000, face value, of the bonds to the Northern Trust Company, which had agreed to pay therefor $602,500, together with any accrued interest thereon from May 1, 1923, the date of the bonds, to the date of their delivery, and as a guaranty of good faith had deposited with the county the sum of $12,000 at the time it made its bid for the bonds at the sale thereof and at which sale it was the highest bidder. Pending the clerical work connected with the counting and delivery of the bonds so sold, defendants were for the first time advised that the proceedings to attack the validity of the bonds would be started on May 1, 1923, and on the advice of counsel the Northern Trust Company and the county deferred any further action on the delivery of the bonds pending the filing of the bill herein and the adjudication thereon.

The contentions of appellant are, that the judgment of the circuit court should be reversed because (1) the county board did not comply with sections 18, 20, 21, 22 and 24 of the Roads and Bridges act; (2) the notice calling the special election should have stated that the polls would open at eight o'clock in the morning and close at seven o'clock P. M.; (3) the road funds from which appropriations were heretofore made by the State to pay one-half the cost of constructing and improving State aid roads have been diverted and appropriated for other purposes, and the county board was without authority to issue bonds in anticipation of State aid.

Section 18 of the Roads and Bridges act provides that "whenever the commission shall have made their preliminary order in favor of the construction or improvement of a public highway or section thereof, the commission shall direct the State highway engineer, or the assistant State highway engineer to cause proper surveys to be made and to prepare suitable maps, plans, specifications and estimates

of cost of the proposed improvement," etc. Section 20 provides that "whenever the surveys, plans, specifications and estimates of the proposed improvement are fully completed and determined, the State highway engineer shall make a complete report thereof and deliver the same to the State Highway Commission, and shall also transmit a copy thereof to the county board of the county wherein it is proposed to construct the improvement." Section 21 provides that upon receiving the surveys, plans, specifications and estimates aforesaid the State Highway Commission shall finally determine whether it will authorize the construction of the proposed improvement as a State aid road, and cause a copy of such determination to be transmitted to the county board. Section 22 provides that the county board, after notice of such decision of the State Highway Commission, shall determine whether it will authorize the proceedings necessary to enable the county to contribute one-half of the cost required for the construction of such State aid road, etc. Section 24 provides that in case the county finally determines to make provision for constructing the State aid road the county clerk shall at once notify the State Highway Commission of such intention.

There was no attempt to comply with any one of said sections by the county board of DuPage county, and such was not necessary. The Roads and Bridges act clearly provides for two methods of letting contracts for the building of State aid roads. Under the general method prescribed by the Roads and Bridges act, the Department of Public Works and Buildings, under section 26, is to advertise and let the contracts for the State aid roads therein provided, and the sections above named are only applicable to the contracts so let, and were enacted for the special purpose of binding both the State and the county to pay for such roads so let, one-half by the State and one-half by the county.

Section 15*d* is a special act or addition to the Roads and Bridges act, enacted for the purpose of authorizing

any county to build or let contracts for building State aid roads in such county, and such section provides the whole method therefor without reference to the other sections above referred to.   This section as passed in 1915 and amended in 1917 provides that in case any county desired to construct or improve highways selected as State aid roads more rapidly than its allotment of State aid roads money would permit, such county might advance the entire cost of such improvement or construction and take the necessary steps to construct and improve the same, and if such roads were constructed "under, and in accordance with, plans, specifications, estimates of costs and contracts approved by the State Highway Commission," and were found, "upon inspection of the State highway engineer, to have been completed as provided for in said contracts," the allotment of money made thereafter by the State might be applied on the payment of any bonds or other obligations which might have been issued to meet the cost of such improvement or construction, to the extent of not more than one-half the cost of such improvement or construction. The section then provided that the county might issue bonds if the voters at a general or special election gave their consent to raise money to so improve or construct such roads, and gave a form of ballot to be used in voting for or against the bonds.   It also authorized the county board to submit a proposition to the voters of the county for the levying of an additional tax to pay for the bonds, and gave a form of ballot for that vote.   The section further provided that the county board of such county, before adopting a resolution to submit such questions to a vote, shall adopt a resolution specifying the particular roads to be improved, the type of improvement to be made on each section of such roads, the proposed width of the paved and graded roadway, together with an estimate of the cost of such improvement, all of which shall have been approved by the State Highway Commission.   The county board in this case

had complied literally with this last provision before having the proposition of issuing the bonds submitted to a vote of the people, and it did all that it was required to do before having the bond issue voted upon and also the special tax voted upon. It was then authorized to sell bonds, as it did do, to raise money to build the roads. After raising the money it is then authorized to build the roads, and when it has let the contracts and has built the roads it will be entitled to receive allotments of money from the State, to be applied on the payment of the bonds to meet the cost of such improvement or construction to the extent of not more than one-half the cost thereof, provided that such roads be constructed "under, and in accordance with, plans, specifications, estimates of costs and contracts approved by the State Highway Commission," and are found, "upon inspection of the State highway engineer, to have been completed as provided for in said contracts." The contracts, under this section, are clearly to be let by the county, but the State reserves the right to have the contracts completed according to specifications and plans of its own suggestion and within its estimates of costs before it will recognize any obligation to contribute one-half the cost thereof. All these plans, specifications and estimates by the State Highway Commission may be furnished at the time of the letting of the contract for the building of the roads, but they are not conditions precedent to a vote for bonds and for levying a special tax.

It does not seem to us to require any further discussion of or comment upon the provisions of section 15*d* to show that sections 18, 20, 21, 22 and 24 are not applicable to the procedure for the construction of roads by a county as provided in section 15*d,* and that the latter section is rather a special or particular provision for the construction of State aid roads by a county, added to the general provisions for the construction of such roads by the State. It is a well settled rule of construction that where there. are

two provisions, one of which is general and designed to apply to cases generally, and another is particular and relates only to one subject, the particular provision must prevail and must be treated as an exception to the general provision. *Dahnke* v. *People,* 168 Ill. 102.

We do not think that appellant's contention that the election being opened one hour earlier and closed two hours earlier than it should have been, furnishes any ground for sustaining its bill for injunction, even if the Election law of 1872 does apply to this special election as to the opening and closing of the polls. There is no allegation in the bill, and no proof was offered to the effect, that any legal voter was deprived of his right to vote because of such election opening and closing at the hours aforesaid. The election notice was in full compliance with the law in all other particulars. The authorities are to the effect that where the great body of the electors have actual notice of the time and place of the holding of an election and of the questions submitted, the election notice is sufficient, and particularly where no prejudice is shown. (9 R. C. L. 991, 992.) On page 1107 of the volume of R. C. L. just cited, it is said: "Ordinarily a provision as to the time of opening and closing of the polls is considered directory, on the general principle that a statute is to be regarded as directory if the directions given to accomplish a particular end may be violated and yet the given end be, in fact, accomplished and the merits of the case unaffected. The particular hour of the day in the case of an election is not of the essence of the thing required to be done, and where the law fixes the opening and closing of the polls at sunrise and sunset, the election should not be invalidated because the polls were closed a few minutes before or were kept open a few minutes after sundown." It is said on page 1108 of the same volume, that even where the polling place in one precinct was not opened at all and no election held, that that, of itself, did not invalidate the election held in the county

314—6

unless it was made to appear that the general result was changed, and that the burden of showing that the result was changed lies upon the person contesting the result of the election. It is again said on page 993, that whether or not any failure to comply with a provision of an election law shall invalidate an election depends upon the character of the irregularity or defect or the special circumstances surrounding the election. In the case now in hand the election was held under the Australian Ballot law, and the people of this State have been acquainted with that law for many years and know the time of the opening and closing of the polls under that law. The Election law of 1872 is rarely ever in use in any election wherein the polls are to be opened at eight o'clock A. M. and closed at seven P. M. We think this case should be governed by the rule announced in *Cleland* v. *Porter,* 74 Ill. 76, and that before the people should be deprived entirely of the result of this election it was incumbent upon the complainant to allege in its bill facts that would show or tend to show that the election would have been otherwise had the law of 1872 been followed. The natural presumption is that the people of DuPage county, who have been voting so long under the Australian Ballot law and within the hours prescribed thereby, did not expect the polls to close at seven o'clock P. M., and that complainant is not prejudiced by the fact that they were not so closed or that they were opened an hour earlier than the old law prescribes.

The objection that although the voters of DuPage county approved and voted for the bonds in question they did so only upon the theory that the State would reimburse the county for one-half thereof, and that there is no legal obligation upon the State to do this, we consider without merit. The law provides for such reimbursement, and while it is true that such obligation cannot be enforced legally against the State, yet we must assume good faith upon the part of the State, and cannot hold the county bond issue bad on

the theory that voters acted in reliance upon an obligation that the State would repudiate. Illinois is not a State that repudiates its obligations.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*